# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| MALLORY M. CHADBOURNE, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| VS. | ) ) **Civil Action No.** ) |
| KIA MOTORS AMERICA, INC. and KIA MOTORS CORPORATION, | ) ) ) ) |
| *Defendant.* | ) ) |

## PLAINTIFF'S COMPLAINT

**To the Honorable United States Judge of Said Court:**

COMES NOW, Mallory M. Chadbourne (hereinafter referred to as "Plaintiff"), and respectfully files this Complaint against Kia Motors America, Inc. and Kia Motors Corporation (hereinafter referred to as "Defendants"), and in support hereof would state and show the following:

### I. Parties

1. Plaintiff Mallory Chadbourne is an individual and she resides in and is a citizen of Solon, Maine.

2. Defendant Kia Motors America, Inc. is a foreign Corporation registered in the State of Maine and at all relevant times doing business in the State of Maine and

service of process upon this Defendant may be had by serving its registered agent for service, CT Corporation System, 128 State St. #3, Augusta, Maine.

3. Defendant Kia Motors Corporation is a foreign Corporation at all times doing business the State of Maine, and service of process upon this Defendant may be had by serving its president, Noi-Myung Kim, 231231, Yangjae-Dong, Seocho-Ku, Seoul, 137-928, Republic of Korea.

## II. Jurisdiction

4. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

5. The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## III. Facts

6. On or about June 20, 2017, Mallory Chadbourne was driving a 2014 Kia Rio (VIN#KNADN5A30E6410355) leaving a driveway onto Route 9 in Eddington, Maine.

7. The subject vehicle was designed by Defendants.

8. The subject vehicle was manufactured by Defendants.

9. The subject vehicle was also assembled and tested by Defendants.

10. While attempting to leave the drive the subject vehicle struck another vehicle traveling eastbound on Route 9.

11. At the time of the accident, Mallory Chadbourne was properly seated and properly wearing the available seat belt.

12. However, despite being properly seated and properly wearing the available seat belt, Mallory Chadbourne sustained serious injuries when the vehicle failed to protect her because it violated several crashworthiness principles.

13. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

   1. Maintain survival space;

   2. Provide proper restraint throughout the entire accident;

   3. Prevent ejection;

   4. Distribute and channel energy; and

   5. Prevent post-crash fires.

14. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

15. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

16. Crashworthiness safety systems in a vehicle must work together like links in

a safety chain. If one link fails, the whole chain fails.

17. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

18. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

19. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

20. General Motors has stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

21. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

22. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle. Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and

refuse or fail to offer that same safety technology to consumers in America.

23. It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

24. In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

25. This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

26. Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number one fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

27. Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

28. Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

29. Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

30. Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

## IV. Cause(s) of Action as to the Kia Defendants

31. Plaintiff hereby re-states and re-alleges each and every allegation contained in pargraphs 1 – 30 herein as though set out hereafter in full.

32. The Kia Defendants owed a duty of care to the Plaintiff.

33. It was entirely foreseeable to and well-known by Defendants that accidents and incidents involving their vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

34. Indeed, the Plaintiff was using the vehicle in a manner that was reasonably foreseeable by Defendants.

35. The serious injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents.

36. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein and was unreasonably dangerous at the time it was sold by Defendants.

37. The vehicle reached Plaintiff without significant change in the condition in which it was sold.

38. Defendants, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

39. As detailed herein, the vehicle contains and/or Defendants have committed either design, manufacturing, marketing, assembling, and/or testing defects.

40. Defendants either knew or should have known of at least one safer alternative design which would have prevented the serious injuries to Mallory Chadbourne.

41. In addition to the foregoing, Defendants, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendants knew and/or should have known of the following, non-exhaustive list of defects:

   a. The side structure is weak and inferior;
   b. The side structure contains a single 214 beam;
   c. The single 214 beam is too low to provide any meaningful protection;
   d. The side structure fails to contain UHSS, AHSS, boron, ferrite, martensite, complex phase, dual phase and TRIP steel in the door ring, door beam, rocker, sill, pillar, header, side rail, roof rail;
   e. The side structure enadequacies allowed the door structure to intrude into the survival space at least 4 inhes further than its static position;
   f. The vehicle failed to protect the safety cage;
   g. The vehicle failed to protect the survival space;
   h. The vehicle failed to protect the occupant survival zone;
   i. The vehicle failed to use long duration side curtain;
   j. The vehicle failed to utilize a side curtain that provides sufficient coverage such that the near side occupant can literally miss the deployment curtain;
   k. The vehicle violated principles of crashworthiness;
   l. The Defendants failed to conduct FEM, FEA and finite modeling analysis with different material and designs to evaluate safer alternative designs; and
   m. The defects and negligence were the producing, direct, substantial and proximate cause of the injuries and damages in question.

42. Defendants further failed to conduct proper testing and engineering analysis during the design, development, and/or testing of the vehicle.

43. Defendants breached their duty of care to Plaintiff and were negligent in the manufacture, assembly, marketing, and/or testing of the vehicle in question.

44. Defendants are strictly liable to Plaintiff for the defective design and/or manufacture of the subject vehicle.

45. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death;

46. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

47. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

48. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

49. A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

50. Based upon information and/or belief, Defendants either used or knew about advanced features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

51. Defendants' occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

52. When Defendants designed the subject vehicle, they did not reinvent the wheel. Defendants used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicle. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

53. Defendants are currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendants are also in possession of what, if any, engineering analysis was performed.

54. However, it is expected that after all of these materials are produced in discovery and/or after Defendants' employees and corporate representatives have been deposed, additional allegations may come to light.

55. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

56. The foregoing acts and/or omissions, breach of duty, design and/or manufacturing defects, and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the Plaintiff's serious injuries and damages.

### V. Damages to Plaintiff

57. Plaintiff hereby re-states and re-alleges each and every allegation contained in pargraphs 1 – 56 herein as though set out hereafter in full.

58. As a result of the acts and/or omissions of Defendants, Mallory Chadbourne

has endured pain and suffering, impairment, mental anguish, emotional distress, impairment, and disfigurement, interference with her daily activities and a reduced capacity to enjoy life as a result of her injuries.

59. As a result of the acts and/or omissions of Defendants, Mallory Chadbourne has become obligated to pay extensive medical expenses as a result of her injuries.

60. As a result of the act and/or omissions of Defendants, Mallory Chadbourne has suffered lost wages and potential lost wages into the future as result of her injuries.

61. Therefore, as a direct and proximate result of Defendants' acts and omissions, Plaintiff seeks all elements of damages available to her under Maine and Federal Law, including, but not limited to: Medical costs, both past and future; pain and suffering; extreme emotional distress and mental anguish; loss of enjoyment of life; lost wages; lost earning capacity; and out of pocket expenses.

62. The above and foregoing acts and/or omissions of the Defendants, resulting in the serious injuries to Mallory Chadbourne, have caused actual damages to Plaintiff in excess of the minimum jurisdictional limits of this Court.

## VI. Prayer

63. WHEREFORE, for the reasons presented herein, Plaintiff prays that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recovers judgment against Defendants for:

    a. actual damages;
    b. prejudgment and post-judgment interest beginning June 20, 2017;

    c.    costs of suit; and

    d.    all other relief, general and special, to which Plaintiff is entitled to at law and/or in equity, and/or which the Court deems proper.

DATED:  March 5, 2018

Respectfully submitted,

/s/ Blair A. Jones
Blair A. Jones, Esq.
State Bar No. 002257
bjones@joebornstein.com
**LAW OFFICES OF JOSEPH L. BORNSTEIN**
5 Moulton Street
P.O. Box 4686
Portland, ME  04112
(207) 772-4624 – Phone
(207) 523-5855 – Fax

and

**The TRACY firm**
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
EToddTracy@vehiclesafetyfirm.com
Stewart D. Matthews
State Bar No. 24039042
SMatthews@vehiclesafetyfirm.com
Andrew G. Counts
State Bar No. 24036408
ACounts@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas  75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax
**Attorneys for Plaintiffs**